608 So.2d 39 (1992)
Michael R. LOSS and Michael R. Loss, P.A., Appellants,
v.
Joan C. LOSS, Appellee.
No. 91-1174.
District Court of Appeal of Florida, Fourth District.
August 19, 1992.
On Motion for Rehearing and Clarification October 28, 1992.
*40 John F. O'Donnell, Fort Lauderdale, for appellants.
Joan C. Loss, Plantation, pro se appellee.
On Appellee's Motion for Rehearing and Clarification October 28, 1992.
PER CURIAM.
The former husband appeals from a final judgment of dissolution, which reflects that the parties met on March 7, 1991 for purposes of a status conference. The status conference, without notice, became a final hearing. The husband claims this was error. We agree and reverse.
Generally, the "notice required for any proceeding which may produce a final result is `notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Hart v. Hart, 458 So.2d 815 (Fla. 4th DCA 1984). A court may not determine matters not noticed for hearing and not the subject of appropriate pleadings. Id. Additionally, this court has held that "when a party has not notice of a trial date, the trial court abuses its discretion when it proceeds with a final hearing." Watson v. Watson, 583 So.2d 410 (Fla. 4th DCA 1991) (emphasis supplied).
Here, the record does not contain any notice of trial on the dissolution of marriage. Indeed, this cause of action was not yet at issue. The record indicates that there were still three pending motions to be heard  two involving the husband's motion to strike the wife's second amended answer and counterclaim, and one involving the wife's motion for contempt. Where pending motions directed to the pleadings are yet to be heard, it is error to conduct a "final" hearing in the cause of action. See Fla.R.Civ.P. 1.440(a) (an "action is at issue after any motions directed to the last pleading served have been disposed of...."); see also International Jai-Alai Players Ass'n v. Dania Jai-Alai, 563 So.2d 1117 (Fla. 4th DCA 1990).
The former wife argues that the final judgment should be affirmed because it was entered pursuant to an oral settlement agreement between the parties. We are unable to agree with the wife's contention. The hearing transcript makes clear that the former husband did not enter into a valid oral settlement agreement under Florida law.
Part of the transcript reads as follows:
THE COURT: What I'm going to do is I normally would speak to the two lawyers and he doesn't have one. I'm going to speak to you and him for a minute and let everyone else wait outside. I want to see what I can do.
(Whereupon, all persons, except for Mr. Franken and Mr. Loss exited the court's chambers.)
MR. FRANKEN: Can my client stay?
THE COURT: Normally, I would just have the lawyers here. He's representing himself. Let her wait with her mother and son and daughter. There's no need for her to be here. We're going to discuss this. All right. You've got to pay more than $4,000. I mean, it's too far away. What do you think?
* * * * * *
This is a tough trip, but its a lifetime marriage. I'd like her to take $6,000. I'm going to have problems getting her to take that amount, but that's a fair amount. You'll give her the house, the lot and you're done.

*41 MR. FRANKEN: And health insurance.
THE WITNESS: I would be glad to give her the house and the lot, but I have serious problems giving her $6,000. It just ain't there. In the office we have to pay rent checks. We had to pay the mortgage payments to the house late, because we're running zero bucks in the office. It's as simple as that. There is a real recession going on.
THE COURT: She pays the taxes?
MR. FRANKEN: Sure.
THE COURT: He doesn't?
MR. FRANKEN: He gets a tax advantage, so the reality of his paying $6,000 is 
THE COURT: Let's go off the record. (Whereupon, an off-the-record discussion was had.)
(Whereupon, Mr. Loss exited the Court chambers and Mrs. Loss and family reentered the Court chambers for a discussion with the Judge, which was off the record.)
THE COURT: We tried to resolve this. It hasn't worked. He's offered $6,500 a month. We're giving the house and two lots. That's all. His accountant spoke for him and that's it. If you don't want to accept that, we'll have a trial.
MRS. LOSS: Then we'll go to trial.
THE COURT: I want you to look into the mental competency of your client. I'm not certain anymore. I want her to be examined. You were good. I think you were fair in your offer, but I'm done. We're not able to resolve this and I have got other cases. I spent more time in this one case than any other case.
NANCY LOSS [The parties' adult daughter]: Can she sign later?
THE COURT: No, now or we're out of here. I have other cases. Tomorrow I have a load of cases.
MR. FRANKEN: Could we restructure it so some is construed to be a distribution of her interest in the business and not taxable? It would be a return of capital and some of it wouldn't be taxable.
THE COURT: She put in very little capital. Those are the numbers.
MRS. LOSS: $7,000 and I will sign.
THE COURT: We're done. I'm going to recuse myself from this case. I'm out of this case and then you can have whatever luck you get. What do you want?
MRS. LOSS: I need an hour to think.
THE COURT: I don't have any more hours. This is it. $6,500 a month, your medical insurance is paid for 
MR. LOSS: Was that medical insurance?
THE COURT: Keep the medical.
NANCY LOSS: All right.
THE COURT: You made a good decision. You made a good decision too. I'm telling you yours was better because you're done. You never would have been done. This would have been an ongoing story.
NANCY LOSS; She pays the mortgage and she wants a car.
THE COURT: That's great. Help her buy a car. We're all done. Write it up and I will sign the order.
(Emphasis supplied.)
In Roskind v. Roskind, 552 So.2d 1155 (Fla. 3d DCA 1989), the court affirmed an oral settlement agreement under circumstances very different from the case presently before the court. In Roskind, both parties were represented by counsel. During recess of the trial, they announced to the judge that they had reached a settlement and the husband's counsel read the agreement into the record. The wife later refused to sign the settlement, but the trial court entered a final judgment incorporating the agreement.
The Third District affirmed:
A stipulation properly entered into the record, where there is clear understanding of the finality of that agreement, is an effective and enforceable settlement notwithstanding that it is subject to reduction to a written document.
Id. at 1156. The court noted that after the terms of the agreement had been read into the record, the wife affirmed her understanding and "unequivocally agreed." The court then quotes from the record to show that the wife was asked specifically whether she understood the agreement, whether she had an opportunity to speak with her *42 attorneys, whether she entered into the agreement freely and voluntarily, and whether she had any questions. See also Silva v. Silva, 467 So.2d 1065 (Fla. 3d DCA 1985).
Here, the same safeguards were not present. The former husband, although accompanied by his accountant, was not represented by counsel at this status conference. More importantly, the parties' assent to the "agreement" was hardly clear and unequivocal. Indeed, the transcript indicates that the parties did not agree on most of the key provisions which were subsequently incorporated into the final judgment.
For example, the final judgment awards the wife $6,500 per month in permanent alimony, yet there is no part of the transcript which indicates that the husband affirmatively agreed to pay this amount. In fact, he argued that he could not afford $6,000 per month. It was only after an off-the-record discussion that the judge stated that the husband would pay $6,500. It is not clear whether the husband was even in the courtroom at the time of this statement by the judge. The judge actually states: "His accountant spoke for him and that's it."[1]
The transcript also reveals that the trial judge rejected the wife's suggestion that the alimony be structured as a return of capital of her share of the husband's medical practice, yet that provision is included in the final judgment. Another provision in the final judgment directs the husband to provide 12 postdated alimony checks on January 1st of each year. The husband is also required to obtain a letter of credit to pay the monthly alimony. These issues were never discussed at the hearing on March 7th.
The final judgment also awarded attorney's fees to the wife in the amount of $15,000. The husband never stated on the record that he would pay this or any other amount. Moreover, the wife's attorney was never sworn in to testify as to the amount of hours expended or the amount of his hourly rate. There is no affidavit from him regarding this information. No expert testimony was presented. The attorney for the wife simply stated that at the time of the hearing, he had expended over $12,000 in fees.
Attorney's fee awards must be supported by substantial competent evidence. Cohen v. Cohen, 400 So.2d 463 (Fla. 4th DCA 1981). "Implicit in this is the requirement that the value of services be proven by expert witnesses." Id. Because the husband never agreed to pay and the wife never presented substantial competent evidence, the fee award was clearly in error. The final judgment also directs that the fee be paid out of the husband's IRA account, and that the remainder be awarded to the wife. This was never discussed at the hearing.
In addition to requiring the husband to pay the wife's medical insurance, which had been discussed during the hearing, the court also ordered the husband to be responsible "for all medical expenses for JOAN C. LOSS not covered for any reason by the health insurance provider including all deductibles, co-insurance and non-covered items." These expenses were not part of the discussion at the hearing.
Also, this court has held that although a trial court may properly provide for the payment of medical expenses, they must, at a minimum, be limited to those which are reasonable and necessary. Black v. Black, 490 So.2d 1334 (Fla. 4th DCA 1986). Here, there is no such limitation. But even if the court had limited the expenses to those which are reasonable and necessary, it would still be error. In Van Metre v. Van Metre, 551 So.2d 593 (Fla. 2d DCA 1989), the trial court erred when it ordered the husband to "pay all reasonable and necessary medical expenses incurred by the wife which are not covered by insurance obtained by her employer." According to the Second District: "Such an open-ended *43 and unlimited financial liability is unenforceable." Id. at 594.
The court ordered the husband to pay the wife's $5,100 medical bill. This was not discussed during the hearing. The husband was held responsible for all of the debts relating to the marital home. This was not discussed during the hearing.
Because the husband never agreed to most of the terms in the final judgment of dissolution, we do not consider it a valid settlement agreement. If there is one point of agreement with Judge Farmer's dissent, it is that the judicial systems of this state and country in the 1990's place a high premium on settlement of disputes. It is wholly permissible and appropriate for judges at all levels to promote settlement of pending litigation. Although one might advocate that a judge should "draw the line" at becoming an active agent in the negotiating process, at the very least, we think such a role should be approached with great caution and circumspection.
While it is not our purpose to criticize the trial judge's activism in urging the parties to settlement here, the very nature of his involvement mandates that due process considerations be scrupulously observed. Why would a trial judge expend so much time, energy, and effort in presiding over settlement proceedings, only to risk exactly what has occurred here by not setting forth all the terms of the settlement, as well as all parties' affirmative assent thereto, on the record? We hold that the failure to do so, particularly in the complexities of domestic relations litigation, is error.
We therefore reverse the final judgment of dissolution for a new trial on all economic issues.[2]
REVERSED AND REMANDED WITH DIRECTIONS.
POLEN, J., and ALDERMAN, JAMES E., Senior Justice, concur.
FARMER, J., dissents with opinion.
FARMER, Judge, dissenting.
It would be difficult for me to imagine a reversal with more pernicious results than the one the court makes today. In this case, the trial judge said on the record that the parties had agreed in his presence (but not on the record) to a comprehensive settlement agreement of their dissolution of marriage litigation. The effect of the nullification of that settlement on one of the litigants is bad enough. But this decision could also conceivably upset the finality the law attaches to consent judgments and settlement agreements. With the persistent growth in litigation in Florida, anything that erodes the usefulness of the settlement device can only be viewed with foreboding.
It would be difficult for any lawyer to overestimate the importance that our legal system places on voluntary agreements ending lawsuits. The benefits to society are self-evident. Thus, in Broward County nearly every civil case placed on a trial calendar is sent to mediation under rule 1.700(a), Florida Rules of Civil Procedure. Settlements are blessed; it is imperative to enforce them. See, e.g., Robbie v. City of Miami, 469 So.2d 1384 (Fla. 1985) (settlement agreements are highly favored and will be enforced whenever possible).
Consequently, I had supposed until today that our court would begin its analysis of an attack on such an agreement with the premise that every doubt would be resolved in favor of the settlement rather than against it, and that we would strain to find ways to save rather than to invalidate it. I had also supposed that a consent judgment would be set aside only upon a showing of fraud, mutual mistake or actual lack of assent, see BMW of North America Inc. v. Krathen, 471 So.2d 585 (Fla. 4th DCA 1985), which would have to be proved by clear and convincing evidence. It is dismaying to me today that none of these principles is mentioned, let alone applied by the court.
*44 Equally unsettling (pun intended) is the failure of the court to discuss even the basic precepts of appellate review. The trial judge's assertions shall be presumed correct and his assertions shall be presumed to have arisen from positions taken by the parties or resulted from their conduct. The failure of the record to support a judge's assertion is construed against the appellant and not against the appellee, and an appellant has the burden of showing unmistakably that error has been made. All are, apparently, inapplicable for some reason.
To begin, I note that here the husband's attack on this consent decree is not based on an assertion that he never actually agreed to the deal, but only on the disingenuous contention that the record does not show that he assented. We have thus set aside this agreement on grounds which have nothing to do with the recognized basis for such extraordinary relief, but which rather concern only the trial that was supposedly avoided by this settlement.
The court's opinion notwithstanding, I perceive that the court is really bothered most by three aspects[3] of the settlement agreement: (1) there is no written memorialization of the agreement or positive manifestation of assent by the disclaiming party on the record; (2) the husband did not have a lawyer present when the agreement was said to have been reached; and (3) the transcript of the proceedings is filled with gaps or "off-the-record" discussions. Not a single one of these furnishes a valid reason for undoing a final judgment based on a negotiated settlement.
The absence of a formal, written settlement agreement, or an on-the-record statement of assent by the husband, is the very least of reasons to vacate the judgment. Before 1978, rule 1.030(d), Florida Rules of Civil Procedure, said in part:
(d) Stipulations. No private agreement or consent between parties or their attorneys shall be of any force unless evidence thereof is in writing, subscribed by the party or his attorney against whom it is alleged.
Effective in 1978, the foregoing rule was replaced by what is now rule 2.060(g), Florida Rules of Judicial Administration, which says in pertinent part:
(g) Stipulations. No private agreement or consent between the parties or their attorneys concerning the practice or procedure in an action shall be of any force unless the evidence of it is in writing, subscribed by the party or his attorney against whom it is alleged. [e.s.]
The addition of the limiting words "concerning the practice or procedure in an action" had the obvious effect of confining the writing requirement to stipulations affecting practice and procedure. It thus entirely abolished the notion that agreements to settle a case had to be in writing or be stated on the record to be enforceable. Sockolof v. Eden Point North Condominium Ass'n, 421 So.2d 716 (Fla. 3d DCA 1982); see also Buskirk v. Suddath of South Florida Inc., 400 So.2d 810 (Fla. 3d DCA 1981). To the extent that Roskind v. Roskind, 552 So.2d 1155 (Fla.3d DCA 1989), could conceivably be read to hold that formal assent to an oral settlement must be made on record (and I do not think that its text can be tortured into that meaning), I should simply refuse to follow it.
Just as unavailing is the absence of a lawyer representing the husband. He had previously been represented by an attorney in this case. By his own admission, however, *45 he discharged the lawyer and assumed his own representation "to save money." If a party in a civil action wants to proceed without a lawyer, that party should not be heard later to cite his lack of a lawyer as a basis to relieve himself of something that happens in the lawsuit which he attributes to the lack of legal advice. Litigants, like people in the everyday world, should be held to have consented to the foreseeable consequences of voluntary conduct. The right to make choices necessarily incorporates the obligation to accept the natural results of the choices made.
The court cites Fleming v. Fleming, 408 So.2d 238 (Fla. 4th DCA 1982), to suggest that there was a colorable claim that the settlement was "patently unfair." I admit to doubts about the wisdom of trial judges trying to determine whether agreements to end lawsuits are "reasonable." How any judge can possibly know whether a given monetary amount or property value is worth the price of peace is simply beyond me. The cost of an armistice may be dear to one person, slight to another. Dissecting a settlement to see whether its parts, individually or together, add up to some subjective measure of fairness or reasonability is a business suffused with unreality. It should be attempted only by mediators or lawyers, perhaps, but not by judges.
My doubts, however, have little to do with my construction of Fleming as essentially requiring that the agreement be facially unreasonable. This means that the elemental unfairness should leap off the page. Here it does not. In fact, reasonable judges could differ on whether this agreement is fair. I do not believe that Fleming was intended to allow settlements to be challenged on the ground of "unfairness," unless the one in issue is so obviously indefensible that no one could disagree. If Fleming really means otherwise, then I think we should recede from it. Until we do, I would leave it to its precise facts, which I understand to involve an unsophisticated, long-term wife agreeing with her lawyer-husband to let him have it all largely his way.
Finally, the lack of a complete transcript is ordinarily thought to cut against the appellant, not the appellee. If this husband did not formally say on the transcribed record that he agreed to the settlement, the record does nevertheless reflect that the trial judge, who participated directly, personally and extensively in the negotiations[4], said that he did agree to the settlement off the record. That statement is entitled to a presumption of correctness.
The lack of a record showing something contrary to what the trial judge said occurred off the record can only be taken to mean that what he said is true. The judge's denial of a "rehearing" (actually, the motion sought to have the agreement vacated) only adds strength to the presumption of correctness.[5] In short, the trial judge's refusal to set aside the consent judgment, which the husband sought on the very grounds argued here, represents his factual finding that the husband did consent to the precise judgment entered.
Yet we have taken the extraordinary step of whisking aside all of the above principles and vacating an apparently valid consent judgment, all in the name of "fundamental fairness." Few settlements occur without a later feeling that one has given up too much or accepted too little. It is very easy afterwards to say that one really did not actually agree to this or that, because one did not consider some nowdiscovered tax, or other, consequences.
When we begin, as we apparently have here, to allow parties to upset consent *46 judgments on such grounds, we might just as well repeal the mediation statutes and rules, forget about settlements and try every case filed (summary judgment not being available in most cases). I could not disagree more profoundly than I do.

ON APPELLEE'S MOTION FOR REHEARING AND CLARIFICATION
Although we adhere to our determination to reverse the final judgment and remand for further proceedings, we wish to clarify some points raised by Joan C. Loss's pro se motion, as well as our opinion.
Although our opinion of August 19, 1992, ends with the directive that the cause is remanded "for a new trial on all economic issues," we did not intend to foreclose the possibility that the parties may yet settle this dispute short of a trial. As long as such a settlement meets the procedural and due process concerns raised by the majority opinion, there is no reason why a valid, binding settlement cannot be reached here as in any other dissolution litigation.
We further note that Mrs. Loss's motion raises concerns that our setting aside the purported agreement was based on Dr. Loss not having an attorney at the March 7, 1991, status conference. Clearly, the failure of a party to secure counsel (absent fraud or duress, neither of which was shown to have occurred here) would not justify setting aside a purported agreement. The references to Dr. Loss's failure to have counsel present were included in connection with our analysis of the trial court's very aggressive efforts to secure an agreement, to show the overall circumstances which led to our determination that no valid agreement occurred.
Parenthetically, we note Mrs. Loss's concern that our opinion referred to the former husband as "Mr. Loss." Of course we are aware that he is a medical doctor. The portions quoted are from the court reporter's transcript of the conference, which, as always, we quoted verbatim as the reporter transcribed it.
The motion for rehearing raises yet another issue which was not raised by the appeal nor considered in our opinion. In her challenge to that portion of our opinion which held insufficient any agreement by Dr. Loss to be responsible for all of Mrs. Loss's medical expenses, the former wife seeks to distinguish Van Metre v. Van Metre, 551 So.2d 593 (Fla.2d DCA 1989), and cites Hill v. Hill, 415 So.2d 20 (Fla. 1982). In Hill, while declining to abrogate the doctrine of interspousal immunity, the supreme court pointed out that in dissolution proceedings, an abusive spouse could be held responsible for all medical expenses, as well as "permanent injury or disfigurement or loss of earning capacity from such abuse when setting alimony." Id. at 21. Assuming Mrs. Loss has pled entitlement to these items based on Dr. Loss's alleged abuse (or if she is allowed to amend her petition on remand to so plead), there is no reason why the trial court cannot fashion an award accordingly. Indeed, our opinion does not preclude such an award even without Mrs. Loss' having to plead and prove spousal abuse. It can be done based solely on her need and his ability to pay. In short, our opinion does not say or imply that on remand, Mrs. Loss cannot receive the same or even greater benefits. Neither did we say the agreement was unfair or inequitable to Dr. Loss. We simply held that the record[1] does not support the trial court's finding of the requisite agreement by both parties, affirmatively stated on the record (or by signed agreement, which obviously did not occur here), and stating in full all the terms of the agreement.
Finally, lest the parties have concerns that our opinion of August 19, 1992, vacated that part of the final judgment which dissolved the marriage, we grant clarification to the effect that our opinion should have contained the usual caveat "except as *47 to the dissolution of marriage granted," prior to reversing on the balance of the purported settlement.
REHEARING DENIED; CLARIFICATION GRANTED IN PART.
POLEN, J., and ALDERMAN, JAMES E., Senior Justice, concur.
FARMER, J., dissents with opinion.
FARMER, Judge, dissenting.
There is not a single thing I could say in favor of reconsidering our entirely erroneous decision in this case that would improve on what Mrs. Loss has herself said in her own motion for rehearing (submitted in her name alone and without any lawyer's signature). I have therefore decided simply to reprint its most telling words and let the gentle reader decide for her/himself who should prevail.[2]
1. This divorce was litigious and bitter and it took many, many hearings to finally agree on a settlement by both parties, for you to remand this case for more litigation is unconscionable.
Fraud did not play a part in this settlement nor did mistake nor lack of assent. Dr. Loss agreed to the settlement, Joan C. Loss agreed to the settlement. Dr. Loss has since remarried (over a year and five months) on these settlement terms agreed upon.
For the 4th DCA to consider that he did not agree, is erroneous. As soon as he did agree, he remarried on the terms of the final judgment.
During the entire hearing, Dr. Loss nodded his head in agreement and never said that he didn't want the divorce, or didn't agree with the settlement nor did he ever mention that he would like to talk to a lawyer before he agreed.
What about the presumption of correctness concerning the judges statement about both parties agreeing?
At least twice Judge Seidlin saw and heard Dr. Loss agree, and a Judge would not purgerize [sic] himself and jeopardize his own character, on such an important issue.
On Page 27 Line 23, (of the transcript) The Judge states, "He's offered $6,500 a month" This cemented Dr. Loss' offer to the record.
After both parties agreed to the entire settlement, Judge Seidlin said, on Pg. 29, line 16 "You made a good decision (addressing Dr. Loss), You made a good decision too" (addressing Mrs. Loss).
Both parties agreed to the settlement, neither party ever consented to bifurcation, as such practice is frowned upon, and the convenience of an early remarriage does not justify it's use.
2. During the proceeding Judge Seidlin refers to Dr. Loss as Doctor, One of the many issues needing clarification, is the fact that the 4th DCA refers to Dr. Loss, as Mr. Loss, when in fact, Dr. Michael R. Loss M.D. is a well established obstetrician/gynecologist with a large and lucrative surgical practice developed over the past 20 years.
* * * * * *
3. To clarify the facts, In the start of the hearing, Judge Seidlin stated: Page 3 line 19, "We're trying to get a divorce completed and we're trying to alot [sic] a certain amount to her if he approves it and their lawyer approves it and resolve this thing."
At that point, any party who was not interested in getting a divorce and settlement agreement could have left the room, at no time during the proceeding, did Dr. Loss say, "I don't have a lawyer, I want to do this when I have a Lawyer." As the record reflects, during the entire extensive litigation, Dr. Loss was represented by expert and expensive counsel. Just before the settlement hearing, he "dumped" his expensive expert attorney (who was President of the Bar Association), showed up himself on the day of the hearing, agreed, remarried, then after he was safely remarried, hired another *48 expensive attorney to appeal the entire settlement.
Dr. Loss is an extremely educated man, and must be held accountable for the choices he makes.
It was only after everyone agreed to the settlement that Judge Seidlin divorced the parties, because he knew how dangerous bifurcation would be for these parties.
The trial judge said on the record that the parties had agreed in his presence (but off the record) to a comprehensive settlement agreement to their dissolution of marriage litigation.
If the Judge said everyone agreed, then everyone agreed.
At no point is [sic  in?] Dr. Loss' appeal, did he ever prove that he did not agree to the settlement, indeed, his agreement is more than evident, both in the courtroom and afterwards.

Roskin vs. Roskin is not a different situation,
As in both cases, both parties agreed and each party must be held accountable for the agreement.
Dr. Loss was always present, along with Judge Seidlin and Charles Franken during the off-the-record discussions,
Then Dr. Loss left the chambers after conveying to the Judge his settlement terms.
There was nothing left to be decided upon, Judge Seidlin himself claims, on page 28, line 11: "I've spent more time on this case than on any other case." Since both parties agreed to the settlement in his presence, the matter was settled.
Judge Seidlin's refusal to set aside the consent judgment, which Dr. Loss sought, represents his factual findings that Dr. Loss did consent to the precise judgment entered.
4. Van Metre vs. Van Metre is drastically different, and this is the error of fact that needs the most clarification. You quote that the trial court erred when it ordered the husband to pay all reasonable and necessary medical expenses incurred by the wife which are not covered by insurance obtained by her EMPLOYER."
Obviously, Mrs. Van Metre was well enough to work, Unfortunately Mr. Loss was permanently physically disabled and disfigured by Her Former Husband Dr. Michael Loss' constant abuse and violence and is totally unable to work due to injuries Dr. Loss inflicted upon her including a crushed throat, torn rotator cuff, numbness in his right hand, two spinal fractures, a right foot that is weakened and needs crutch support, her tenth rib had to be removed, and most days she can barely leave her sickbed.
An oral argument was not requested by Dr. Loss' attorney because he did not want you all to see the physical impairments, disabilities and deformities Dr. Loss inflicted upon Joan C. Loss.
Indeed, on March 7, 1991, Mrs. Loss had her nurse present. (Page 12, Line 18)
The Court asks "Who is this young lady, the nurse in your office?
Witness (Dr. Loss): No
Court: Oh, you're a nurse for this woman (referring to Joan C. Loss)"
On Page 26, Line 10, The Court states:
"You married her for a lifetime. This is a lifetime marriage. I'm just letting you know, it's a lifetime marriage. You have two beautiful children from it and right now she's ill."
In Poe v. Poe 522 So.2d 50, 51 (Fla. 5th DCA 1988) the Court ruled
"The former husband should at least be required to pay the medical expenses which his former wife may incur in the future because of the injuries received as a result of his admitted physical abuse."
All of the injuries Mrs. Loss has are a direct result of Dr. Loss beating her. She has no other physical disabilities, other than the ones he has inflicted upon her, And it is completely enforceable that Dr. Loss should take care of the damage that he inflicted upon Joan C. Loss.
In addition, Hill v. Hill, 415 So.2d 20, 21 (Fla. 1982) the Court emphasized that:

*49 "We emphasize that the trial judge in a dissolution proceeding has authority to require an abusive spouse to pay necessary medical expenses and the authority to consider any permanent injury or disfigurement or loss of earning capacity from such abuse when setting alimony."
How come these important issues of how Dr. Loss disabled Joan C. Loss were not addressed by the appellate Court? When then were taken into consideration by Judge Seidlin?
* * * * * *
5. How can anyone say that this agreed settlement is inequitable when Joan C. Loss can never live a normal life again and is racked by pain,
Dr. Loss has remarried and is living a lavish lifestyle with a new wife, new home new cars, and new investments.
When indeed a husband permanently disables his wife by battery and she suffers permanent and painful disabilities and can never have a normal life and must have to endure severe pain due to torn muscles and nerve damage, and rib removal and the husband can go out dancing 
Who is to say what is fair, except a judge who has a superior vantage point and himself admits, "I've spent more time on this case than any other case."
To have to redo the whole settlement is prejudicial and unconscionable, This final judgment must be affirmed.
I agree with her. We should set aside our previous opinion in its entirety and affirm the trial judge's denial of relief from this settlement.
NOTES
[1] We decline to speculate on the substance of the discussions that might have taken place off the record. Roskind makes clear to us that assent to the terms of an oral settlement agreement, which has been negotiated off the record, must be entered on the record at some point in order to be affirmed on appeal. That never happened here.
[2] We also note that the trial court erred by denying the husband's motion for rehearing without a hearing on the matter. The husband argued in his motion that the final distribution of assets was inequitable. Where an agreement is alleged to be patently unfair, a trial court should determine whether it is unreasonable on its face. Fleming v. Fleming, 408 So.2d 238 (Fla. 4th DCA 1981).
[3] I have deliberately omitted the "notice" issue, because there simply is no such issue possible on this record. The hearing was a special appointment called to consider pleading matters and contempt. During the course of the hearing, the judge obviously decided to exert his energies toward a settlement, rather than to decide pleading questions or resolve failures to supply discovery, in the apparent belief that he would better serve the parties to avoid more attorney's fees by exhausting all possibilities of settlement himself. To describe what resulted as a "final hearing" entirely mischaracterizes it. For me, the only fair description is that it turned into a settlement, or mediation, conference  with the trial judge as the mediator. It was only after the parties manifested their agreement to the settlement in his presence that the judge went back on the record and took testimony of residency and the unmendable breakup of their marriage.
[4] Another unspoken problem, for my colleagues, with this case is apparently the trial judge's unusual activism in seeking a settlement. While I agree that the judge exerted great influence on the parties to settle the case, I do not agree that he went too far. He made it clear that he was urging the wisdom of settlement, not that he was requiring it.
[5] The failure to hold an actual hearing on the motion for rehearing does not, of course, mean that the judge did not consider its contents. The Seventeenth Judicial Circuit has long had a rule that allows the trial judge to decide motions for rehearing without holding an actual hearing on the motion. That is a salutary rule; it recognizes that rehearings should be rare, and the necessity for one should be made apparent on the face of the motion itself.
[1] While it might seem to some that we are splitting hairs, Mrs. Loss's suggestion that Dr. Loss nodded his head in agreement and failed to protest as the trial judge discussed the proposed terms, is not enough. The trial court must elicit express consent to all terms on the record in dissolution proceedings.
[2] What follows is a verbatim reprint of the motion for rehearing  with all of its grammatical and stylistic idiosyncracies.